Good afternoon. We have one case on our calendar this afternoon. It is United States v. Powell, number 19-8083. Mr. Titus, you may proceed. Thank you, Judge, and may it please the Court. First and foremost, I want to thank the Court and apologize for any inconvenience for the from the November hearing. The appellant, Mr. Powell, had a reasonable expectation of privacy from law enforcement sticking their nose into a crack from a garage door. If this Court affirms the District Court finding, the legal theory of curtilage as we currently know it and protections afforded therewith are dead and law enforcement will have complete autonomy to physically inspect any area, any crack, any seam connected to the home. No lengthy or complicated analysis is needed to determine whether gaps in a home crack are intimately tied to the home. To quote... Didn't the officer testify that he never touched the garage when he smelled the marijuana? I apologize, Judge Kelly. I say, didn't the officer testify that he never touched the garage when he smelled the marijuana? Judge, that may be true. He was on that walkway, wasn't he? Judge, he was mere inches away from the garage door. I think the body camera that's part of the record in this case will show he was mere inches away. He wrote in his affidavit of probable cause that he smelled the odor of raw marijuana coming from a crack in the garage door. Well, Counsel, didn't he also say that he smelled the marijuana before entering the driveway? And Judge, he did say that, but I think it's convenient testimony. Neither on cross-examination, neither his police report nor the affidavit of probable cause indicated he smelled that marijuana at that point. Well, Counsel, don't we have to view the evidence at this point in the light most favorable to the government? I believe so, Judge, but in something like this, I think we need to defer to the district court's findings, which didn't make those findings. Instead, it made the findings that the smell was coming from the crack in the garage door. Well, that's where it came from, but it got out of the crack, didn't it? Yes, but as the court could view in the record, when he brought the other deputies over to him to smell the crack, they were mere inches away from the garage door. Didn't the district court hold that neither the walkway nor the driveway was curtilage in these circumstances because of the commercial nature of the property? That's correct, Judge. And how do you get around that? And I think, correct, I think we have to look at the specifics of the property. Towards the west side of the building is more of a, I guess, house setting, and of the east side was two doors to the commercial side of the building. When you look at the west side of the building, as Mr. Powell testified on examination, was that there were no trespassing signs posted up into the driveway on the west side of the building. The west side isn't where the officers walked. That's correct. You were out from the east side around the sidewalk to connect to the west side. And the west side faced storage area for cars that customers paid to have stored there. Totally. That's correct. So the walkway was commercial. There was nothing that separated that concrete pad from that area. Well, I want to make sure the court, I apologize, Judge. I want to make sure the court understands the dynamics of this property correctly. The west side of the residence faced towards the public roadway and has a driveway and garage. The east side of the residence has two doors on one end of the residence and the other end of the garage. That's correct. It's the north side that faces the area where people store cars for storage. Would it be fair to say then that even if the driveway is curtilage, that the walkway is not because it's part of the commercial portion of the property? That's correct. The walkway would probably be a divider between the commercial and the residential portion. However, the deputy smelled the marijuana coming from the garage door in the driveway. Okay, I'm back on the initial question. I thought he said that he smelled it first from the walkway and then entered the driveway to confirm the smell. And if he smells it from the walkway, then he's not on the curtilage. And that's correct. And the district court didn't make those findings. And it was the first time anyone in the courtroom had heard of marijuana coming from the walkway. And I would ask the court to err on the side of the district court's findings, which said he was inches away off of the driveway. What do you do about the cases that say driveways are generally not perfect? I would agree with that. But I think as we look into, I think the Jardines quotes the best. And when it quoted the fourth, when the opinion was written, it said the Fourth Amendment right to be free of unreasonable governmental intrusion would be of little practical value if the stage agents could stand in a home's porch or side garden and trawl for evidence with impunity. And I think when you're standing next to a garage door off of a driveway, if that's not as close as a deck or a side garden gets, then I don't know what it is. Except that Jardine was not talking about a residence set in the middle of a commercial storage area. And I think that's correct. However, when Deputy Cox got to the area where the garage door was, it was clearly residential at that point. Counsel, why should we consider your, is it Jardines? If that's the correct pronunciation or Hardin is, why should we consider that property-based argument when the district court denied your motion on a privacy-based ground under Katz? And that's a very good question too, Judge. I think that the court did the incorrect Dunn analysis. And when those factors are taken into account, I think that society is prepared to recognize a reasonable privacy interest in a garage, in two garage doors connected to a house, even though it neighbors a commercial property. Essentially, if the court affirms the district court's findings, what it's saying is even if you neighbor a commercial property, there are no private interests. And I reserve the remainder of my time for rebuttal at this point, Judge. Thank you, Counsel. Mr. Copham. Good afternoon, Your Honors. May it please the court, Mr. Titus. Your Honors, before I jump directly into my argument, I do want to address a couple of questions that Your Honors posed to Mr. Titus. Judge Kelly asked, didn't one of the deputies testify he first smelled marijuana on the walkway north of Mr. Powell's residence? And notably, Mr. Powell testified that that area was a commercial area. He said he had it all rented out and it was where customers could store their vehicles. In fact, a deputy did testify to that. There is a video of his body cam where I believe it's about the three minute and 15 second mark or right about there. You can actually audibly hear the deputy take a deep breath, confirming that that is in fact what he's doing. He's trying to confirm that he smells marijuana from a commercial area. Now, the district court did not make a finding that that was the first time that it was smelled, but it didn't make a finding that he was not credible in that regard. It just, for whatever reason, it chose to move directly to the driveway where deputies confirmed that they smelled it. Your Honors, turning back into it, this really is a case that's unique, and it's unique because of the facts surrounding where Mr. Powell decided to live. This is a commercial facility. It's called Anytime Storage. It's subject to presumably dozens of licenses that have been issued to customers where they can come and go 24 hours a day, seven days a week. Law enforcement traversed what the government really designates as three separate areas, a commercial road to the east of his residence that is between storage units in his residence and also provides access to that storage area for vehicles north of his residence. Law enforcement then also traversed through that storage area north of his residence where they smelled for the first time marijuana coming from the garage before ultimately going onto the driveway. It sounds like there's no real disagreement that the areas east and north of Mr. Powell's residence were commercial parts of Anytime Storage, so I won't go into a deep-dug analysis of why that is not curtilage, and instead I'll just focus on the driveway itself. Could I just follow up on one thing you said? We do have this 24-hour storage business, but isn't it more accurate to say that the property has a mixed use in that Mr. Powell lived there on the property? I mean, he lived in the mobile home on the property. That's his residence, so it isn't purely commercial, is it? No, you're absolutely correct, Your Honor. It is not purely commercial at the time deputies go onto it. The interior of the office had certainly been converted to a residence, and no one is arguing that Mr. Powell did not have a reasonable expectation of privacy in his actual residence on the property. But notably, Your Honor, there was no intrusion into his residence, at least not until law enforcement obtained a warrant. Although it's mixed use, the other areas remain commercial, and we know from Dunn that in order for a commercial entity to have a reasonable expectation of privacy in its areas, it needs to take an affirmative step to actually exclude the public, and that never happened here. So Mr. Powell, he started leasing the office about September 4th, 2018. It's clear from the record Anytime Storage didn't start operation that day. There was testimony this had been its office, and it had issued express licenses, not implied licenses like those present in Jardines. And I apologize, I may be mispronouncing that case as well. But when it issued the tenancy to Mr. Powell, it took no steps to modify the licenses it had already issued to the general public. It took no steps to exclude the public from the areas north of his house, east of his house, or even west of his house. And Your Honors, this is notable because as the testimony showed, there was really two ways to access that storage area where vehicles could be stored north of his house. One could enter through Anytime Storage property, and you could park on that road. But another way that the public or a customer could have accessed that area would be to park on the garage and enter through that opening north of his driveway. So there was no step to stop customers from continuing to engage in that practice to the extent that they wanted to. Now, obviously, Mr. Powell, he had to have a way to park his car in his garage, and he certainly could have driven over that driveway. But there's nothing in the record to demonstrate that the customers were deprived of their rights to cross the driveway to go there. So this is not a Jardine situation, really, at all. Jardines involved an implied license. Here, the record demonstrates we had express licenses for customers to come and go over that area. And presumably, since law enforcement testified, they routinely patrolled this area with the consent of the owner. The fact that nothing had been modified there, there's really no basis to argue that law enforcement was where they shouldn't have been when they went onto the driveway. Tell me again, what's the source of an express license to use the driveway? Well, Your Honor, in Dunn, the court had... Well, no, I'm asking factually. Where's an express license? Something written down somewhere? In the record, Your Honor, there is, I believe, two samples of lease agreements for customers who rent space from Anytime Storage. And those lease agreements provide access to customers 24 hours a day, seven days a week. Notably, Your Honor, that includes, for example, making a payment. So a customer, there was testimony that there was a payment drop box on one of the doors to Mr. Powell's residence. And presumably, a customer could have approached that to make a payment. There's nothing in that agreement providing access to the property that suggests the customer can't go anywhere on that property. There is one fact in the record, Your Honor, that does demonstrate Anytime Storage, presumably for the benefit of Mr. Powell, did take a step to exclude people, including law enforcement, which is that there was a no trespassing sign on a small yard to the southwest of his residence. But it's undisputed in the record, law enforcement never actually entered that yard throughout the course of this case. Well, counsel, let me just ask, if the driveway was, in fact, curtilage, is there still a pathway for this court to affirm? Absolutely, Your Honor. First of all, marijuana was first smelled from the actual commercial area north of the building. That's undisputed testimony. The district court didn't make any finding really at all about that, but that's undisputed. But additionally, Your Honor, there is some exigency here. A deputy smells the odor of burning marijuana. He's trying to confirm it. Obviously, vapors, things like that, they disappear and evidence is lost. So there is a basis to affirm, Your Honor. Did they find any marijuana when they went in and made their search? Your Honor, I'm not certain that this is actually in the record, because the crux of this case was obviously the methamphetamine. So I don't know. I do know, Your Honor, again, this may be outside the record, and maybe the court should not consider this, but one of the individuals inside testified he had been smoking marijuana, or not testified, but relayed to law enforcement that he had been. Ultimately, Your Honor, one more question about the driveway. I noticed that in your brief, you said the driveways frequently are not subject to a reasonable expectation of privacy. But don't we have to take into account the Supreme Court's recent decision in Collins against Virginia that recognized the top of the driveway as curtilage? Your Honor, I apologize. I'm not familiar with that case. I think that it obviously has to be taken into account. And I will say, Your Honor, there's another recent denial of cert by the Supreme Court, which was Bovat versus Vermont, where I believe it was Justice Gorsuch. He was quite displeased by some game wardens who had lingered for about 15 minutes on a driveway, peering in through windows, and never even made it to the front door to knock. Without knowing the specific facts of the case you cite, I would assert this case is distinguishable, even though that was a denial of cert from what occurred in Bovat. And the reason why I would assert that, Your Honor, is here we have a totally different fact pattern in terms of the actual landscape of where the house resides, which is material, which is that we have overlapping licenses for customers. It appears that this area really remained commercial in every way, except for the interior of Mr. Powell's home. And law enforcement first detected marijuana not on the driveway or even on any area that is arguably connected to Mr. Powell's residence, but instead on that commercial walkway north of his residence. Well, if they smelled it off the curtilage, could they then go on the curtilage to smell it better or smell it more? Well, again, Your Honor, I think there is some exigency because these vapors disappear, they go away. Obviously, the district court didn't make a finding on that, and I'm uncomfortable offering a firm opinion without the opportunity to research that further. And obviously, I'd be happy to do so if this court feels it would like supplemental briefing. Thank you. Unless there's any further questions, I would respectfully ask that this court affirm the district court's denial of Mr. Powell's motion to suppress in its entirety. The record is clear that law enforcement first smelled marijuana on an area that was commercial property where they were entitled to be. And they did what we want law enforcement to do, which was they then left and obtained a search warrant and executed it later. Thank you, Your Honors. Counsel, are you relying at all on a theory of inevitable discovery? Your Honor, I did brief that. I don't think the court needs to get there. But obviously, there's a question about whether or not law enforcement should have been, or there's not a question, we wouldn't say there's a question, but there's a dispute about whether law enforcement should have been on the driveway. The government does raise the issue of inevitable discovery, which really the doctrine seeks to place law enforcement in the place it would have been but for an unlawful search. If this court were to conclude that for some reason, the district court erred and law enforcement should not have been on the driveway. Again, the record is undisputed that law enforcement first smelled the marijuana from that commercial walkway north of the residence. So the outcome would have been the exact same. They could have left at that moment, knowing the facts they knew and obtained the very same search warrant, which would have led to the same exact discovery of methamphetamine. Unless there's any other questions, thank you for your time. Thank you, Counsel. Mr. Titus, you have your rebuttal time. Thank you, Judge. I want to focus the court, I think, on one important thing that we're forgetting, is that Deputy Cox's purpose when going around to the other side of the property wasn't knock and talk. He testified that it was to do a protective sweep. While the deputies were on the east side of the building, they were knocking. Deputy Cox does not wait for them to knock. As a matter of fact, he walks around to the other side while they're still knocking. I think this fact in and of itself... Didn't he stay on the walkway when he went around? That's correct, until he got to the driveway when he went up to the garage door that was directly up from the driveway. Through the gap in the fence there. Yes, that's correct. That's correct, Judge. He testified that his purpose was not knock and talk or to reach the front door there. It was a security sweep. And that differentiates this case from the other cases that have allowed someone or law enforcement to go to the back door, in particular, Shuck and Hatfield and Rains, where those instances they did go into the backyard or to the back door and it was allowed. Further, there was no testimony that that door was commonly used for any kind of people going into the property. As a matter of fact, the testimony was to the opposite of that. The three law enforcement officers that were doing surveillance earlier that evening testified that people were coming and going from the side of the building, the east side of the building, where they did the knock and talk. And so that difference... Isn't it routine in these situations when somebody's knocking on the front door for an officer to go around the back for safety purposes? It happens all the time. And he testified that there wasn't somebody coming out of the back that could come around and attack them. But I thought you said he stayed on the walkway when he went around the property. So he would have seen that, but he was not on the property itself. Judge Seymour, first, I don't believe there was any reason to believe that firearms or any kind of weapons were to be involved. Why, this wouldn't be a dangerous fella. So I'm not sure that the rationale for a protective sweep is there as it was in Shuck. Further, at the point when Deputy Cox started doing the protective sweep to go around back, it's different than Shuck because law enforcement, the neighbors had previously smelled marijuana. So there was some suspicion that there may be marijuana there or not. However, in this case, there wasn't that suspicion. And to Judge Kelly's point, Judge... Yes, he went on the walkway on the side, went through the opening in the fence, and then was in the driveway, went all the way up to the driveway to the garage door, and that's where he smelled the marijuana coming from the crack in the garage door. But I think that this case, inevitably, is very different than the other cases. I don't believe there was any evidence of any kind of exigent circumstances or consent. Shuck, in the Shuck case, they had a purpose to go into the back door because it was known that that was a back door that was commonly used. There was no testimony whether there was any evidence of surveillance cameras, as in Shuck. In Shuck, there was no evidence that someone was living there, unlike the Powell case. And most importantly, I think, is that in the Shuck case, the neighbors originally called law enforcement because they smelled marijuana. Here, there wasn't. I would like to talk about the inevitable discovery, though. If we were to strike the portion of the search warrant containing what Deputy Cox's findings were of marijuana, all that's left in the four corners of the search warrant is Mr. De La Torre's statement that two days prior, there was marijuana in his vehicle. As the court notes and the record shows, there was no indication in that search warrant where he obtained the marijuana, that he smoked marijuana at Mr. Powell's residence, or anything like that. It's just that someone left his house and had marijuana. Further, regarding inevitable discovery, I'm going to, again, probably rely on the facts that the court made, the district court made, that they made no findings that Deputy Cox smelled marijuana on the side walkway. Instead, it was up the driveway and next to the garage door. And if there are no further questions, I thank the court for your time. Thank you. Thank you to both counsel for your arguments this afternoon. The case will be submitted and counsel are excused.